Joseph W. Landers, Jr. Interim Executive Director Department of Natural Resources Tallahassee
QUESTION:
Must the Department of Natural Resources comply with the disclosure requirements of s. 119.07(1), F. S. (1978 Supp.), upon receipt pursuant to s. 11.45(6)(d), F. S., of the list of adverse findings made by the Auditor General at the conclusion of the audit, or only upon receipt of the final audit report?
SUMMARY:
A list of adverse audit findings delivered by the Auditor General to an audited official or office for explanation or rebuttal pursuant to s. 11.45(6)(d), F. S., is a public record and is presumptively subject to the disclosure and inspection requirements of s. 119.07(1), F. S. (1978 Supp.); such list of adverse findings is not a part of the `audit work papers and notes' referred to in s. 11.45(6)(b) and has not otherwise been expressly exempted from s. 119.07(1) or expressly made confidential by the Legislature. When doubt exists as to the applicability of the requirements of s. 119.07(1) to a particular document or record, such doubt should be resolved in favor of compliance with s. 119.07(1).
Pursuant to s. 11.45(6)(d), F. S., at the end of his audit, the Auditor General is required to discuss the audit with the official whose office has been audited and is required to submit to the official or the office a list of adverse findings, to which the official must make a written explanation or rebuttal within 20 days. I am advised that, upon completion of the audit, a tentative draft of the final report is prepared and from that report the list of adverse findings is excerpted and submitted to the audited official. Upon receipt by the Auditor General of the response or rebuttal of the audited official to the list of adverse findings, the audit report may be amended, depending upon the content of the rebuttal.
Your question must be examined in light of the most recent decision of the Florida Supreme Court construing Florida's Public Records Law (Ch. 119, F. S.), Wait v. Florida Power Light Company, 372 So.2d 420 (Fla. 1979), rehearing denied, June 21, 1979. Therein, the court directly construed s. 119.07(2), F. S. (1978 Supp.), which provides for exemptions from the disclosure requirement in s. 119.07(1). The key provision in the court's decision and the key to this inquiry is paragraph (a) of s.119.07(2), which provides:
 All public records which presently are provided by law to be confidential or which are prohibited from being inspected by the public, whether by general or special law, shall be exempt from the provisions of subsection (1).
The court held that the language `provided by law' in s.119.07(2)(a) `excludes any judicially created privilege of confidentiality and exempts from public disclosure only thosepublic records that are provided by statutory law to beconfidential or which are expressly exempted by general or speciallaw.' [Id. at 425; emphasis supplied.]
At issue here, then, is whether the list of adverse findings, which are required by law to be submitted to the audited department and which are required by law to be explained or rebutted by that department, must be made available by the Department of Natural Resources for public inspection. Regardless of the status of preliminary findings when in the hands of the Auditor General, the list of adverse findings referred to in s.11.45(6)(d), F. S., upon its receipt by the Department of NaturalResources, clearly falls within the statutory definition of `[p]ublic records' set forth in s. 119.011(1), F. S.:
 `Public records' means all documents, papers, letters, maps, books, tapes, photographs, films, sound recordings or other material, regardless of physical form or characteristics, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency. (Emphasis supplied.)
Having determined that the list of adverse findings, when received by the audited agency, is a public record, it must next be determined whether that public record is exempt from the disclosure requirements of s. 119.07(1), F. S. (1978 Supp.), by virtue of having been `provided by statutory law to be confidential' or `expressly exempted by general or special law' as stated in Wait, supra. The answer to this question will turn on an interpretation of the scope of, and intent behind, the following language in s. 11.45(6)(b), F. S.:
 The audit report when final shall be a public record. The audit work papers and notes shall not be a public record; provided, however, those work papers necessary to support the computations in the final audit report may be made available by a majority vote of the Legislative Auditing Committee after a public hearing showing proper cause. The audit work papers and notes shall be retained by the Auditor General until no longer useful in his proper functions after which time they may be destroyed. (Emphasis supplied.)
In attempting to discover the Legislature's intent in enacting the above-quoted provision, I examined the title to Ch. 69-82, Laws of Florida, which first enacted the language in question. Prior to that enactment, there had been no exemption for `work papers and notes' or for any other documents pertaining to an audit. Rather, there had merely been the statement — possibly superfluous or redundant — that `[t]he audit report shall be a public record.' Section 21.121(3), F. S. 1967 (referring to the reports of the former state auditor). While not an operative part of an act, the title serves the function, not only of providing notice of its contents, but of limiting and defining the scope of the act. Finn v. Finn, 312 So.2d 726, 730 (Fla. 1975); and County of Hillsborough v. Price, 149 So.2d 912 (2 D.C.A. Fla., 1963). However, the title to Ch. 69-82 not only fails to clarify the scope of the public records disclosure exemption contained or intended to be contained in that act, but contains no language stating or implying that any exemption whatsoever from the Public Records Law or imposition of confidentiality was intended in Ch. 69-82.
Therefore, I must look to the language in the essential portions of the body of Ch. 69-82, Laws of Florida, which language is now codified as s. 11.45(6)(b) and (d), F. S. In so doing, I likewise find no clear indication that the Legislature intended to exempt the list of adverse findings referred to in s. 11.45(6)(d) from disclosure by the audited agency or official pursuant to s.119.07(1), F. S. (1978 Supp.). I similarly find nothing on the face of that language which would conclusively sustain an interpretation or conclusion that the `list of adverse findings' referred to in s. 11.45(6)(d), when in the hands of the audited agency or official, is the same as the `audit work papers and notes' referred to and exempted from disclosure in s. 11.45(6)(b), or that the list is the same as (or to be treated the same as) a preliminary audit report in the hands of the Auditor General.
It may be that the reference in s. 11.45(6)(b), F. S., to the audit report's being a public record `when final' has the converse effect of making preliminary drafts of the audit report confidential while in the hands of the Auditor General (although that question has not been asked and is not here answered). Nevertheless, I find no language clearly extending any such confidentiality as may be exercisable by the Auditor General with regard to a preliminary audit report to the list of adverse findings excerpted from a preliminary audit report when such list is delivered and disclosed to the audited official. I would observe here that there are other statutory provisions wherein certain documents are made confidential and wherein provision is expressly made for the preservation or extension of such confidentiality when those documents are transferred to or used by some other agency or party pursuant to statutory authorization. One such `extension' of confidentiality from one agency to another is in s. 195.084(1), F. S., which authorizes the Department of Revenue to make certain confidential information received from taxpayers available to the Auditor General and the various county property appraisers, but with the proviso that:
 The Auditor General and the property appraisers shall be bound by the same requirements of confidentiality as the Department of Revenue. Breach of confidentiality shall be a misdemeanor of the first degree punishable as provided by ss. 775.082 and 775.083.
Section 316.066(4), F. S., allows confidential accident reports made by persons involved in accidents to be used by the Department of Highway Safety and Motor Vehicles and by other departments for accident prevention purposes, but clearly provides that the reports remain confidential. The pertinent portion of s.316.066(4) provides that `[a]ll accident reports made by persons involved in accidents shall be without prejudice to the individual so reporting and shall be for the confidential use of thedepartment or other state agencies having use of the records for accident prevention purposes . . . .' (Emphasis supplied.) Similarly, s. 371.141(3), F. S., relating to accident reports made by operators of boats to the Division of Marine Resources, provides that such reports `shall be for the confidential use ofthe division or other governmental agencies having use of the record . . . .' (Emphasis supplied.) Another instance in which the Legislature has seen fit to expressly preserve or extend the confidentiality of records which are given over (even temporarily) to another agency may be found in s. 658.10, F. S., relating to certain banking records of the Department of Banking and Finance which are made confidential by statute. Section 658.10(2)(b) provides:
 (b) Confidential records and information furnished in compliance with, or in response to, a legislative subpoena shall be confidential communications and shall retain their confidential status while in the possession of any legislative body or committee receiving the same and shall not be made public, and such confidential status shall continue after the legislative body or committee has returned such records and information to the department or other source from which they came. No member of the Legislature or member of the legislative body or committee, or any employee thereof, or any other person shall disclose or make public any of the information found in such records and information furnished in compliance with, or in response to, any such subpoena, except in cases involving investigation of charges against an officer subject to impeachment, and then only to the extent determined by the legislative body or committee to be necessary. (Emphasis supplied.)
Section 658.10(6), F. S., provides that violation of the above and other disclosure prohibitions in s. 658.10 is punishable as a felony of the third degree. And, finally, s. 960.15, F. S., relating to the records of the Crimes Compensation Commission, provides (albeit superfluously, in light of s. 119.011, F. S.) that records of proceedings before the commission are public records, but then adds the following;
 However, any record or report obtained by a commission member or the commission, the confidentiality of which is protected by any other law or regulation, shall remain confidential, subject to such law or regulation. (Emphasis supplied.)
I am aware of no such provision in s. 11.45(6)(b) or (d), F. S., indicating that any confidentiality as may attach to a preliminary audit report in the hands of the Auditor General would extend to the excerpted `list of adverse findings' delivered to the audited official pursuant to that official's statutory duty to present a rebuttal or explanation. In this context, I would point out part of s. 11.45(6)(d), providing that `[i]f the official is not available for receipt of the list of adverse findings, clearly designated as such, then delivery thereof is presumed to be made when it is delivered to his office.' This wide discretion as to who may receive, and presumably examine, the list of adverse findings does not comport with a clear legislative intent of confidentiality. Of similar import is the requirement in s.11.45(6)(d), that a response to the list of adverse findings be made and submitted to the Auditor General within 20 days from delivery of the list to the audited agency. It seems clear that the response to the list of adverse findings is beyond the reach of any purported disclosure exemption or confidentiality provision in s. 11.45(6), and (since it is made in pursuance of statutory duty) is accordingly a public record subject to inspection pursuant to s. 119.07(1), F. S. (1978 Supp.). It is reasonable to assume that the Legislature was aware that, as a practical matter, disclosure of the response to the adverse findings would, in most cases, also necessarily result in disclosure of the content and nature of the adverse findings which are rebutted or explained in that response.
As to the `audit work papers and notes' referred to in s.11.45(6)(b), F. S., I am inclined to think that the courts would construe that term and the exemption attaching to it as strictly and narrowly as possible, with the likely result that the list of adverse findings would be deemed to be at least one step removed from the audit work papers and notes, and therefore not exempted from disclosure by the audited official pursuant to s. 119.07(1), F. S. (1978 Supp.). By referring to the list of adverse findings as `one step removed' from the audit work papers and notes, I mean that it is my interpretation that the audit work papers and notes consist of what might be termed the `raw data' of the audit, and that it is only after and through the analysis, assimilation, and compliation of such raw data that the audit report and adverse findings drawn from the report are prepared.
That the list of adverse findings referred to in s. 11.45(6)(d), F. S., is, in fact and in effect, one step removed from the `audit work papers and notes' referred to in s. 11.45(6)(b) is strongly supported by definitions and explanations found in judicial decisions of the `working papers' or `work sheets' of an accountant and in a discussion in a prior opinion of this office of the work papers and notes of the former state auditor. The Auditor General is required by law to be a certified public accountant, and he clearly acts as an accountant in conducting an audit and preparing a report and findings based on information examined during the audit. It appears that the term `work papers' and similar terms, such as `working papers' and `work sheets' are well recognized in the field of accounting as having definite meaning or scope, that being the raw data (mathematical computations, notes, calculator or adding machine tapes, and the like) based on which the accountant prepares reports, returns, and findings. In Ablah v. Eyman, 365 P.2d 181, 188, 90 A.L.R.2d 766 (Kan. 1961), the Supreme Court of Kansas set forth the following characterization of an accountant's `working papers' (which term I find for the purposes of this inquiry and in this context to be the same as the term `work papers' used in s. 11.45[6][b]):
 Generally speaking, working papers are the computations and rough notes that an accountant makes in the practice of his profession. They are no `scratch paper' writings because they are compiled far more carefully. Typically, they are clearly labeled, and the computations made on them are explicitly described. For the most part, they contain only accounting data, but they sometimes contain brief narrative explanations as well. They constitute a record of the audit work performed both from a qualitative and quantitative standpoint. That is to say, they constitute proof of what records were examined, what confirmations were undertaken, what inquiries were made, and so forth. The extent to which the audit work was planned and supervised may be evident from them, and they are the accountant's proof of the accuracy of his audit and the fairness of the opinion which he expresses in his reports to his clients. Often they are drafted in pencil instead of pen and ink which in no sense detracts from the careful workmanship ordinarily used by accountants in compiling them. There is a close analogy between the rough notes collected by an attorney and the working papers prepared by an accountant. An attorney collects preliminary rough notes and uses those memoranda as raw material for the preparation of briefs, pleadings, and other legal documents. An accountant, on the other hand, places his preliminary data on working papers and then uses them as the basis for financial *4105 statements, audit certificates, and other accounting reports to his clients. Working papers, then, accomplish the same purpose for accountants that rough notes perform for attorneys (Schugerman's Accounting for Lawyers, 1952; Shannon's Legal Accounting, 1951; Saul Levy's Accountants' Legal Responsibility, 1954). (Emphasis supplied.)
And, in Ipswich Mills v. Dillon, 157 S.E. 604, 605, 53 A.L.R. 792 (Mass. 1927), the court approved the trial court's following definition of an accountant's `work sheets':
 It was found by the trial judge that work sheets meant papers on which original compilations, computations and analyses are made by accountants, which later are gathered together in a
summary form and the figures rendered in a schedule, exhibit, report or return upon which the accountant is working. (Emphasis supplied.)
Concluding similarly is AGO 066-88, in which one of my predecessors in office, specifically addressing the work papers and notes of the State Auditor (the predecessor of the current Auditor General), characterized such work papers and notes as being the raw data, computations, etc., based on which findings are made and a report prepared. While the conclusion and other comments in that opinion do not comport with the present wording and judicial construction of Ch. 119, F. S., those comments defining and limiting the scope of audit work papers are still valid and are applicable to your question. That opinion characterized the State Auditor's `work papers' as information`utilized by any of the assistants of the state auditor inreaching their findings . . . .' The opinion also stated:
 These work papers, etc., which are utilized by auditors and accountants working under the supervision of the state auditor are merely computations evidencing and providing a basis for an ultimate determination. No final determination is reached until after all of this information is assimilated. These work papers, etc., do not appear to be of continuing significance. They are merely mathematical and mechanical steps used in arriving at a final determination. They do not become final until approved by the state auditor. He is the only officer who has the authority to make the final determination as to the correctness of that which has been submitted to him by any of his subordinates. (Emphasis supplied.)
Another indication that the list of adverse findings is not included under the term `audit work papers and notes' is that part of s. 11.45(6)(b), F. S., which provides that the Legislative Auditing Committee may, after holding a public hearing, make available such work papers as may be deemed `necessary to support the computations in the final audit report . . . .' This indicates that the Legislature also perceived the term `audit work papers and notes' as encompassing only what might be termed the `raw data' on which is based the audit report (and findings extracted therefrom).
I am aware of the principle that penal statutes are generally to be strictly construed in favor of the person against whom the penalty is sought to be imposed. Negron v. State, 306 So.2d 104
(Fla. 1974); and State v. Llopis, 257 So.2d 17 (Fla. 1971). However, in the case of Ch. 119, F. S., the Public Records Law, and its penalty provisions, analogy can be drawn to Florida's open meetings or `Sunshine Law,' s. 286.011, F. S. Both Ch. 119 and s.286.011 serve the purpose of allowing the public access to the operations of their government. I find the following language of the Florida Supreme Court with respect to the Sunshine Law in Board of Public Instruction of Broward Co. v. Doran,224 So.2d 693, 699 (Fla. 1969), to be equally applicable to a case such as this, where doubt exists as to whether or not records are open to inspection:
 Statutes enacted for the public benefit should be interpreted most favorably to the public. The fact that the statute contains a penal provision does not make the entire statute penal so that it must be strictly construed. (Emphasis supplied.)
In accord: City of Miami Beach v. Berns, 245 So.2d 38, 40 (Fla. 1971). That the above statement may be as readily applied to questions regarding access to public records as to questions regarding access to public meetings is supported by the following observation made by the Court in Doran, also at 224 So.2d 699, as preface to the quotation above:
 During the past years tendencies toward secrecy in public affairs have been the subject of extensive criticism. Terms such as managed news, secret meetings, closed records, executive sessions, and study sessions have become synonymous with `hanky panky' in the minds of public-spirited citizens. (Emphasis supplied.)
Analogy may also be drawn to the federal equivalent of this state's Public Records Law, the Freedom of Information Act,5 U.S.C. § 552. The courts have repeatedly emphasized that that act's basic purpose and intent was to secure generally, and not to restrict, the public's access to records and information in the possession of governmental agencies and that, accordingly, exemptions must be clearly provided and when so provided must be narrowly construed. See, for example, Dept. of Air Force v. Rose,425 U.S. 352 (1976); Environmental Protection Agency v. Mink,410 U.S. 73 (1973); Poss v. N.L.R.B., 565 F.2d 654 (10th Cir. 1977); and Niemeier v. Watergate Special Prosecution Force, 565 F.2d 967
(7th Cir. 1977).
In this same vein, there is another principle of interpretation that can and should be extrapolated from the Sunshine Law to the Public Records Law. As stated by the Supreme Court in Town of Palm Beach v. Gradison, 296 So.2d 473, 477 (Fla. 1974), `[t]he principle to be followed is very simple: when in doubt, the members of any board, agency, authority or commission should follow the open-meeting policy of the State.' Likewise, I am of the opinion that, when there is doubt as to whether a particular public record such as the list of adverse findings here in question falls within the disclosure requirement of s. 119.07(1), F. S. (1978 Supp.), such doubt should be resolved in favor of the public and the record should be opened for inspection by the public. While I cannot unequivocally determine that the Legislature intended the list of adverse findings delivered to the audited agency to be considered and treated separately and apart from the exempted `audit work papers and notes' of the Auditor General or a preliminary audit report in the hands of the Auditor General, I can unequivocally state that there is very substantial doubt that the list is made confidential or exempted from disclosure under s. 119.07(1) upon its receipt by the audited agency and that such doubt clearly should be resolved in favor of disclosure.
In further support of my conclusion, I would note the obvious, but perhaps overlooked, fact that most, if not all, of the accounts, records, and other data and information examined and analyzed by the Auditor General in conducting the audit and in preparing the audit report and the adverse findings contained therein are public records open to inspection (e.g., travel authorization forms and vouchers, purchase vouchers, correspondence, contracts, etc.). This underlying fact certainly militates against recognizing any but the most clear and express exemption from inspection for any auditconnected document or paper which is based on or refers to such public records. Also see AGO 073-8, in which it was concluded that the governing board of a mosquito control district was required to discuss and prepare a response to adverse findings received pursuant to s. 11.45(6)(d), F. S., at an open meeting at which minutes would be recorded and made available for public inspection. (However, note that AGO 073-8 was based solely on the Sunshine Law, s. 286.011, F. S., and did not consider the Public Records Law or that law's interaction with the Sunshine Law.)
Furthermore, I am advised by the Auditor General that he does not consider that his statutory authority to deny public inspection of his `audit work papers and notes' would be breached by disclosure of the list of adverse findings by an audited official who has received the list pursuant to s. 11.45(6)(d), F. S., nor does he consider that such official's disclosure of the list of adverse findings would be contrary to any authority he may have to keep confidential those audit reports which have not become final. I am also advised by the Auditor General that he would not be hindered or obstructed in the performance of his statutory duties by the audited official's disclosure of the list of adverse findings to which that official is required by law to respond.
In summary, I find no clear indication that any grant of confidentiality which may attach to an audit report which has not been made `final,' and which is in the hands of the Auditor General, was intended to be extended to the `list of adverse findings' excerpted from such report and delivered to an audited agency for mandatory explanation or rebuttal pursuant to s.11.45(6)(d), F. S. I also find no clear indication that the term `audit work papers and notes' in s. 11.45(6)(d) was intended to encompass the list of adverse findings delivered to the audited agency pursuant to s. 11.45(6)(d). Rather, I am of the opinion that the term `audit work papers and notes' should be construed narrowly and limited to such `raw data' as is commonly considered to constitute the work papers of an accountant. I am also of the opinion that, when genuine doubt exists as to whether a public record has been `provided by statutory law to be confidential' or `expressly exempted by general or special law,' as specified in Wait v. Florida Power Light Company, 372 So.2d 420, 425 (Fla. 1979), such doubt should be resolved in favor of disclosure of that record.
Therefore, based on all of the above-stated considerations, and in light of the existence of a criminal penalty for violation of the disclosure requirements of Ch. 119, F. S. (and the corresponding lack of any penalty or sanction in regard to release of records held or made pursuant to s. 11.45[6], F. S.), I must advise you to resolve any doubt you may have as to the applicability of s.119.07(1), F. S. (1978 Supp.), in favor of the public by making the list of adverse findings available for inspection, examination, and copying pursuant to s. 119.07(1) if you are so requested.
Prepared by:
Jerald S. Price Assistant Attorney General